**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 13, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JOHN TYLER HERMAN,

Plaintiff - Appellant,

v.

SIG SAUER INC.,

Defendant - Appellee.

No. 23-6136
(D.C. No. 5:21-CV-01038-R)
(W.D. Okla.)

---

**ORDER AND JUDGMENT***

---

Before **HOLMES**, Chief Judge, **EBEL**, and **ROSSMAN**, Circuit Judges.

---

John Tyler Herman appeals the district court's exclusion of the testimony of his two expert witnesses, William Vigilante and James Tertin, and the grant of summary judgment for Defendant Sig Sauer Inc. ("Sig Sauer") in his suit under Oklahoma law for products liability and other tort claims arising from his injury due to the accidental discharge of his Sig Sauer P320 handgun. Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

**I**

Sig Sauer manufactures firearms, including the firearm in this case, the P320 model pistol. The P320 is a semi-automatic, striker-fired pistol that comes in several different models. As relevant to this case, the model of the P320 Mr. Herman purchased did not possess a manual safety. A manual safety requires a user's deliberate manual manipulation of the firearm to change its condition from the "Safe" condition to the "Fire" condition. In other words, to fire a firearm with a manual safety, two actions are required: disabling the safety and pulling the trigger.

The incident giving rise to this lawsuit occurred on the morning of February 2, 2018. About two years after he purchased the gun, Mr. Herman acquired a new holster that would allow him to carry his P320 in front of his body inside his pants along his waistline, a method known as an "appendix carry." *See* Aplt.'s App., Vol. IV, at 702, Tr. 60:2–20 (Dep. of John Herman, June 28, 2022). The morning after the new holster arrived in the mail, Mr. Herman tried it on as he was getting ready for work. He put his P320 into the holster, unbuttoned his pants, put the holster with the gun in it on his waistband, then rebuttoned his pants. However, Mr. Herman felt that the holster and gun were uncomfortable, so he tried to remove the holster and gun. Mr. Herman's exact description of the subsequent incident follows:

> So then I went to—reached over the gun to grab the holster, and I pulled, and it kind of got caught up, so I pulled a little harder on the holster, and just when I pulled up, that's when—all I remember, it just went off, and then I remember falling on the ground and yelling or kind of screaming a little bit. My ex-wife was—or wife at the time was only, like, five feet behind me on the ground stretching, getting ready for bed.

> She immediately started taking off my pants, trying to find the wound, and she grabbed a towel and started applying pressure to the exit and entry wound. And then fire showed up sometime after that, and I think EMSA [i.e., the ambulance service] and police got there at the same—roughly the same time.

*Id.* at 702–03, Tr. 60:21–61:11. When pressed to elaborate about the motion he used to remove the gun and holster, Mr. Herman testified:

> Yeah, I reached over the gun, grabbed the whole holster to take it out as one unit. . . . So my hand was only on the holster on this side, and then my finger, the pointer finger, I just kind of lifted up on that clip a little bit for the holster, and I pulled like that. (Indicating)[.]

*Id.* at 705, Tr. 72:6–14. Mr. Herman's then-wife confirmed that she did not see the incident but heard the gunshot and turned around to find Mr. Herman screaming and bleeding. She applied towels to Mr. Herman's wound and called emergency services.

One of the emergency responders to arrive at the scene was Oklahoma City Police Officer Jonathan Hurd. Officer Hurd wrote in his police report that Mr. Herman told him "he was trying to pull the gun and holster out of his waistband and the holster got hung up. . . . [H]e then pulled harder causing the pistol to come out of the holster and [Mr. Herman's] finger accidentally to pull the trigger causing the firearm to discharge . . . ." Aplt.'s App., Vol. II, at 74 (Okla. City Police Dep't Crime Rep., Feb. 2, 2018). Mr. Herman does not recall speaking with Officer Hurd.

Mr. Herman was taken to the hospital and suffered serious injuries as a result of his P320 discharging.

## II

On October 25, 2021, Mr. Herman sued Sig Sauer in the U.S. District Court for the Western District of Oklahoma. Invoking the court's diversity jurisdiction, Mr. Herman brought claims under Oklahoma state law for the torts of products liability, negligence, breach of implied warranty of merchantability, breach of express warranty, negligent infliction of emotional distress, and intentional infliction of emotional distress. The focal point of Mr. Herman's legal claims was that Sig Sauer's design of the P320 was defective because the absence of a manual safety enabled the gun to discharge without the trigger being intentionally pulled and that this defect caused Mr. Herman's injury on February 2, 2018.

To support his claims, Mr. Herman proffered the reports and testimony of two expert witnesses, James Tertin and William Vigilante.

Mr. Tertin, a professional gunsmith and director of research and development for the firearms manufacturer Magnum Research, studied Mr. Herman's P320, several competitor model pistols, and "literature for 39 base models of commercially available pistols." Aplt.'s App., Vol. III, at 453–54 (Expert Rep. of James Tertin, Nov. 11, 2022). Mr. Tertin explained that striker-fired pistols like the P320 can be equipped with one of three types of manual safeties. Two "are the focus of this case."[1] Aplt.'s Opening Br. at 7. First, a thumb safety "is a switch on the side of the

---

[1] Mr. Tertin also provided some information about a third type of manual safety: a grip safety. Mr. Herman repeats some of this information about the grip safety in his Opening Brief while summarizing Mr. Tertin's conclusions. *See* Aplt.'s Opening Br. at 14. However, Mr. Herman does not make any substantive arguments

pistol that can be flipped on or off with the user's thumb." Aplt.'s App., Vol. III, at 466. "Unless and until the thumb safety is flipped down, the trigger cannot be actuated." *Id.* at 466–67. Second, a tabbed trigger safety "is a small tab within the trigger that must be depressed for the trigger to be able to fully depress and fire the weapon." *Id.* at 468. "Trigger safeties . . . require a user's finger to be placed squarely on the center of the trigger prior to the pistol being discharged. Therefore, the user is required to more deliberately place their finger on the trigger to fire the weapon." *Id.*

Mr. Tertin explained in his expert report that he reviewed Mr. Herman's deposition alongside the parties' allegations in the litigation and that it was his understanding that "Mr. Herman *believes* he did not pull the trigger on his pistol." *Id.* at 453–55 (emphasis added). After providing his analysis of the design of the P320, Mr. Tertin provided a list of "conclusions." Among these, Mr. Tertin opined, "In the event Mr. Herman's trigger was touched by his finger or a foreign object, the

---

about the grip safety in his appellate briefing. Additionally, he writes in his brief that, "The two widely-used and industry-accepted safeties *that are the focus of this case* are the tabbed trigger safety and the thumb safety." *Id.* at 6–7 (emphasis added). By stating that the focus of his case is only the tabbed trigger safety and the thumb safety, and failing to offer substantive appellate arguments regarding the grip safety (i.e., the third type of manual safety), Mr. Herman has waived any argument about the grip safety. Accordingly, we do not consider the grip safety further. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("[W]e follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."); *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1050 n.18 (10th Cir. 2011) ("declin[ing] to further consider" an issue because the appellant "failed to present any argument or authority" about that issue).

firearm most likely would not have discharged if it was equipped with a manual safety." *Id.* at 472. Accordingly, Mr. Tertin offered the following assessment: "The defective design of the P320 was a proximate cause of Plaintiff's accident, in the event that his finger or a foreign object touched the trigger." *Id.* at 473.

Dr. Vigilante, a consultant on ergonomic design and psychology-informed human factors design, also examined the deposition evidence and litigation materials as well as several model parts of firearms, although he did not examine Mr. Herman's P320. Dr. Vigilante recounted his understanding of the incident: "At no point did Mr. Herman deliberately manipulate the trigger, and he believes it would have been impossible for his hand to make contact with the trigger while it was still in its holster." Aplt.'s App., Vol. III, at 413 (Expert Rep. of William Vigilante, Nov. 11, 2022). He also cited Mr. Herman's deposition testimony for the proposition that Mr. Herman "was confused about how the gun went off, because he did not make contact with the trigger." *Id.* at 419.

Dr. Vigilante explained that he believed the P320 trigger "is significantly more sensitive than competitor striker-fired guns because of the substantially reduced movement required to fire the gun, and as a result is more prone and susceptible to unintentional discharge than other striker-fired guns." *Id.* at 426. In the "findings" section of his report, Dr. Vigilante opined that "Sig Sauer's failure to integrate an external manual safety into the design of the Sig P320 was improper and unreasonably dangerous, rendered the firearm defective and unreasonably dangerous, and was a cause of the subject unintentional discharge and John Tyler Herman's

injury." *Id.* at 443. He also opined, "Had Sig Sauer integrated a tab[bed] trigger safety into the design of the Sig P320, the subject unintentional discharge would most likely not have occurred and John Tyler Herman would not have been injured." *Id.*

On June 13, 2023, Sig Sauer filed three motions: (1) a motion under *Daubert* to exclude the causation evidence and opinions of Mr. Tertin; (2) a motion under *Daubert* to exclude the causation evidence and opinions of Dr. Vigilante; and (3) a motion for summary judgment.

In its *Daubert* motion to exclude Mr. Tertin's testimony, Sig Sauer argued that "[Mr.] Tertin's opinions that a manual thumb safety or tabbed trigger safety would have made Plaintiff's accidental discharge significantly more unlikely lack any indicia of reliability, are based purely on speculation and his own *ipse dixit*,[[2]] and must be precluded pursuant to Fed. R. Evid. 702." Aplt.'s App., Vol. III, at 529 (Def. Sig Sauer, Inc.'s Mot. to Exclude Causation Evid. & Ops. of Pl.'s Expert, James Tertin, filed June 13, 2023).

And in its *Daubert* motion to exclude Dr. Vigilante's testimony, Sig Sauer argued that Dr. Vigilante

> should be precluded from rendering any opinions that the lack of an external safety caused [Plaintiff's] injuries because (1) he lacks the required foundation to render any opinion that an external safety would have changed the outcome of Plaintiff's accident, and

[2] "'Ipse dixit' is roughly translated as 'he himself said it' and refers to a dogmatic and unproven statement." *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1283 n.3 (10th Cir. 2018) (quoting *Ipse Dixit*, BLACK'S LAW DICTIONARY (10th ed. 2014)); *see Ipse Dixit*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Something asserted but not proved.").

> (2) his opinion that an external safety more likely than not would have prevented this accident is based solely on his own *ipse dixit*.

Aplt.'s App., Vol. III, at 344 (Def. Sig Sauer, Inc.'s Mot. to Exclude Causation Evid. & Ops. of Pl.'s Expert, William Vigilante, filed June 13, 2023).

Finally, in its summary judgment motion, Sig Sauer explained that

> as set forth in [its] *Daubert* motions filed concurrently herewith, the causation opinions of two of Plaintiff's liability experts—James Tertin and William Vigilante—are unreliable and inadmissible. Tertin and Vigilante are the only experts Plaintiff designated to address the essential elements of defect and causation. Without any competent expert testimony on causation, Plaintiff cannot establish an essential element of his claims . . . .

Aplt.'s App., Vol. II, at 47 (Def. Sig Sauer's Mot. for Summ. J., filed June 13, 2023).

On September 8, 2023, the district court granted Sig Sauer's *Daubert* motions and motion for summary judgment. As to the expert opinions, the court wrote:

> The Court agrees with Defendant that neither Mr. Tertin nor Mr. Vigilante has a reliable factual basis for these particular opinions. Mr. Tertin and Mr. Vigilante acknowledge that a tabbed trigger will not prevent an unintentional discharge if an object squarely contacts the face of the trigger, a thumb safety will not prevent an unintentional discharge if it is not engaged, and the gun will not discharge without the trigger being fully actuated. But neither expert knows what part of the trigger was contacted or whether a thumb safety would have been engaged. Without these critical facts, the experts' conclusion that a tabbed trigger or thumb safety would have prevented the accident is speculative.

Aplt.'s App., Vol. VIII, at 1751–52 (Order, filed Sept. 8, 2023) (citations omitted).

As to summary judgment, the court wrote that "[t]he summary judgment dispute in this case boils down to a single element: causation." *Id.* at 1755. The district court determined that Mr. Herman's argument that the opinions of his experts

created a genuine factual dispute as to causation "is foreclosed by the Court's determination that the experts' causation opinions are inadmissible." *Id.* at 1757. And, although Mr. Herman argued that his claims could be proven through circumstantial evidence even without the contested experts' testimony, the court found the circumstantial evidence to be insufficient for the same reason the experts' opinions lacked foundation—*viz.*, because there was no evidence in the record (expert *or* circumstantial) that the firearm's discharge was not caused by something squarely contacting the face of the trigger, or that a thumb safety would have been engaged. As such, the district court granted summary judgment in favor of Sig Sauer. Mr. Herman now appeals.

**III**

"We review a district court's application of Rule 702/*Daubert* for abuse of discretion." *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1216 (10th Cir. 2016). "We must afford *substantial deference* to the district court's application of *Daubert*." *Id.* (quoting *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002)); *accord Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005) (recognizing "the wide latitude a district court has in exercising its discretion to admit or exclude expert testimony"). "A court abuses its discretion when its ruling is 'arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Etherton*, 829 F.3d at 1216 (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003)).

"We review the district court's grant of summary judgment de novo." *Stenson v. Edmonds*, 86 F.4th 870, 879 (10th Cir. 2023).

**IV**

On appeal, Mr. Herman first challenges the district court's decision to exclude the opinion testimony of both Mr. Tertin and Dr. Vigilante. However, having considered his arguments, we ultimately agree with the district court that the experts lacked a sufficient factual basis to offer their opinions about causation. Accordingly, we conclude that the court did not abuse its discretion in excluding the two experts' testimony.

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Under Federal Rule of Evidence 702, the district court has an important gatekeeping function with regard to the admissibility of expert opinions to ensure that all evidence is both relevant and reliable." *Roe v. FCA US LLC*, 42 F.4th

1175, 1180 (10th Cir. 2022). *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), guide the court's reliability inquiry. *See Roe*, 42 F.4th at 1180–81. "The reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case." *Id.* at 1181.

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

The district court reasonably concluded that both Mr. Tertin's and Dr. Vigilante's causation opinions were not reliable. Mr. Tertin and Dr. Vigilante both lacked "sufficient facts or data" on which to base their opinions. Fed. R. Evid. 702(b). Specifically, the experts lacked information about how the trigger on Mr. Herman's P320 was engaged during the incident and what actually caused the weapon to discharge.

The thrust of Mr. Tertin's and Dr. Vigilante's challenged opinions is that if Mr. Herman's P320 had been equipped with a manual safety such as a tabbed trigger safety or a thumb safety, the weapon would most likely not have discharged on the morning of February 2, 2018. However, their conclusions are based on speculation—not facts in the record.

First, a tabbed trigger safety only prevents a firearm from accidentally discharging in circumstances where something does not squarely depress the trigger. However, neither Mr. Tertin nor Dr. Vigilante had a factual basis to opine that nothing squarely depressed the trigger of Mr. Herman's firearm. More specifically, neither expert knew what part of the firearm—including the trigger—was touched by Mr. Herman's body or his holster during the incident.

There is no evidence in the record that makes it improbable that some part of Mr. Herman's finger or a part of his holster came into direct contact with the trigger and squarely depressed it. The opinions of Mr. Tertin and Dr. Vigilante are based on liberal interpretations of Mr. Herman's testimony that do not align with the record. Even construed in his favor, Mr. Herman's testimony is only that he did not place his pointer finger directly onto the trigger. He did *not* testify that no other part of his body or holster came into direct contact with the trigger.[3]

More specifically, the record evidence does not make such a direct-contact scenario by Mr. Herman or his holster less probable than any other scenario in explaining the cause of the incident. And if the direct-contact scenario were true, and

---

[3] Indeed, in his Opening Brief, Mr. Herman

> accepts that there must have been some contact with the trigger, albeit unintentional and inadvertent, to result in the unintended discharge. Though there is no evidence establishing the exact way in which the trigger was contacted, Herman's experts (Vigilante and Tertin) agree that there must have been some form of contact with the Sig P320's trigger in order for it to discharge.

Aplt.'s Opening Br. at 13.

the direct contact was square to the face of the trigger, then a tabbed trigger safety would not have prevented the discharge of Mr. Herman's firearm—*viz.*, the trigger safety would have been depressed along with the trigger, and the gun would have discharged. In short, the two experts did not have a sufficient factual basis to conclude that if Sig Sauer had included a tabbed trigger safety on Mr. Herman's P320, the gun would most likely *not* have discharged.

Second, a thumb safety only prevents a firearm from firing if it is engaged. Specifically, the safety switch must be placed in the "Safe" position for it to prevent the discharge caused by a trigger pull. However, neither Mr. Tertin nor Dr. Vigilante knew whether Mr. Herman would have placed a thumb safety in the "Safe" position before trying on his new holster if he had the option to do so. And, if Mr. Herman would not have placed the thumb safety in the "Safe" position, the gun would still have discharged. Accordingly, the experts lacked a sufficient factual basis to conclude that if Sig Sauer had included a thumb safety on Mr. Herman's P320, the gun would most likely not have discharged.

On appeal, Mr. Herman tries to argue that there is evidence that he would have engaged a thumb safety. He points to his deposition testimony that one of the best practices his father taught him about firearm safety as a child was to "always have your safety on until you're ready to shoot." Aplt.'s Opening Br. at 32 (quoting Aplt.'s App., Vol. IV, at 693). However, this argument is (at the very least) effectively waived: Mr. Herman never made the argument before the district court and does not argue for plain error review on appeal, even in his reply brief—despite

Sig Sauer's explicit contention that he did not preserve the argument. *See, e.g.*, *United States v. Leffler*, 942 F.3d 1192, 1198–1200 (10th Cir. 2019); *Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016). Moreover, even if this argument were not effectively waived (and it is), it would not be availing because neither expert pointed to this testimony as a factual basis for his opinion.

In sum, Mr. Tertin and Dr. Vigilante lacked a sufficient factual basis to conclude that the addition of a manual safety to Mr. Herman's P320 would most likely have caused the gun to not discharge during the incident. Accordingly, the district court did not abuse its discretion in excluding their testimony as unreliable.

**V**

Mr. Herman next challenges the district court's grant of summary judgment for Sig Sauer.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

All of Mr. Herman's legal claims require him to show that Sig Sauer's decision to not include a manual safety on his P320 caused the gun to accidentally discharge and injure him. The first element of a products liability claim under Oklahoma law is that "the defect must have (1) caused the injury in question." *Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1085 (10th Cir. 2013) (citing *Kirkland v. Gen. Motors Corp.*, 521 P.2d 1353, 1363 (Okla. 1974)). For an intentional infliction of emotional distress claim, a plaintiff must show that "the defendant's conduct

caused the plaintiff emotional distress." *Comput. Publ'ns, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002). For a negligence claim, a plaintiff must prove "that the negligence was the proximate cause of the injury." *Gillham v. Lake Country Raceway*, 24 P.3d 858, 860 (Okla. 2001). For a negligent infliction of emotional distress claim, a plaintiff must establish the existence of "an injury to the plaintiff *resulting from* the failure [of the defendant to perform its duty to protect the plaintiff from injury]." *Ridings v. Maze*, 414 P.3d 835, 837 (Okla. 2018) (emphasis added). Finally, for a breach of warranty claim, "the buyer has the added burden of proving . . . that the breach of the warranty was the proximate cause of the loss sustained." *Am. Fertilizer Specialists, Inc. v. Wood*, 635 P.2d 592, 595 (Okla. 1981).

Without the causation opinions of his experts, Mr. Herman's claims cannot survive summary judgment. Setting aside the question of whether expert testimony is always required, as a matter of law, in a products liability case, even circumstantial evidence used to prove "an essential fact" in such a case "must have sufficient probative value to constitute the basis for a legal inference rather than mere speculation, and the circumstances proved must lead to the conclusion with reasonable certainty and probability." *Downs v. Longfellow Corp.*, 351 P.2d 999, 1004–05 (Okla. 1960). "[T]he mere possibility that a defect caused the injury is not sufficient." *Dutsch v. Sea Ray Boats, Inc.*, 845 P.2d 187, 191 (Okla. 1992). The causation element of a litigant's claim "must be based upon probabilities, not possibilities." *Id.* (internal quotations omitted).

Mr. Herman has identified no circumstantial evidence that establishes a probability of causation.[4] He has not provided evidence that the thing that made contact with his P320 would likely not have squarely depressed a tabbed trigger, and he has not provided evidence—free from the preclusive effect of our waiver doctrine—that he would likely have engaged a thumb safety. Therefore, without the aid of his experts' impermissible testimony, Mr. Herman cannot establish causation, which is a key element of his legal claims.

Accordingly, the district court's grant of summary judgment for Sig Sauer was proper.

[4] On this point, we part ways with the outcome reached by our sister circuit, which recently decided a similar case involving the same experts, *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213 (6th Cir. 2025). Notably, however, the Sixth Circuit's opinion in *Davis* was based on its interpretation of the products liability standard under Kentucky law, which is not applicable in this case. *See id.* at 1230–31. Moreover, significantly, the Sixth Circuit stressed that its summary judgment ruling was made "in light of . . . the peculiar factual circumstances of this case." *Id.* at 1230. And it is thus important in understanding our different outcome here that the plaintiff in *Davis* presented different evidence than present in this case: notably, Mr. Davis testified "that he did not pull the trigger and that the gun was fully holstered." *See id.* at 1231–32. By contrast, Mr. Herman has not pointed to any clear evidence in the record about whether parts of his body or his holster did or did not come into contact with the trigger of his P320 at the time of the incident. Accordingly, the fact-bound outcome reached by the court in *Davis* does not give us pause in reaching our conclusion here.

## VI

Based on the foregoing, the district court's judgment is **AFFIRMED**.

Entered for the Court

Jerome A. Holmes
Chief Judge

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

June 13, 2025

Mr. Samuel A Haaz
Mr. Ryan D. Hurd
Mr. Robert Zimmerman
Saltz Mongeluzzi & Bendesky
1650 Market Street, 52nd Floor
Philadelphia, PA 19103

Mr. Douglas Neal Letter
Brady Center to Prevent Gun Violence
840 First Street NE, Suite 400
Washington, DC 20002

Mr. Colton L. Richardson
Richardson Richardson Boudreaux
7447 South Lewis Avenue
Tulsa, OK 74136-6808

**RE: 23-6136, Herman v. Sig Sauer**
Dist/Ag docket: 5:21-CV-01038-R

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(d)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc: Kristen E. Dennison
Brian Keith Gibson
G. Calvin Sharpe
Amy D. White
Lyndon Wayne Whitmire
Jonathan T. Woy

CMW/djd